Filed 12/20/22  Knapp v. Diestel Turkey Ranch CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| LISA OLMSTEAD KNAPP, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> DIESTEL TURKEY RANCH, <br><br> Defendant and Respondent. | F082999 <br><br> (Super. Ct. No. CV62536) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Tuolumne County.  Kevin M. Seibert, Judge.

Dumont Law Offices and Mary T. Dumont for Plaintiff and Appellant.

Jackson Lewis, James T. Jones and Dylan B. Carp for Defendant and Respondent.

-ooOoo-

Plaintiff and appellant Lisa Olmstead Knapp brought a lawsuit against defendant and respondent Diestel Turkey Ranch (Diestel), alleging that her former employer misclassified her as an exempt employee and therefore violated various provisions of the Labor Code. She appeals from a June 14, 2021 judgment of the Tuolumne County Superior Court entered in favor of Diestel. For the reasons set forth below, we affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

### I. Background

Headquartered in Sonora, Diestel raises, processes, and sells turkey products. Its clients include Del Monte, Draeger's, Jackson Whole Grocer, Lunardi's, Market of Choice, Newport Meat, New Seasons, Plymouth Poultry, Raley's, Rock Island, Safeway, Tony's Fine Foods, and Whole Foods. Tony's Fine Foods is Diestel's main distributor.

In 2012, Knapp applied for a position at Diestel. She noted in her resume that she "ha[d] been employed in the same field for over 30 years." Specifically, Knapp worked at Tambellini Meat Company between 1980 and 1990; Queen City Farms Produce between 1990 and 1994 as "Assistant to the President"; Facciola Meat Company between 1995 and 2011 as "Director of Sales Service"; and Sysco in 2011 as "Meat and Seafood Representative." Thereafter, Knapp was hired by Joan Diestel (Joan), Diestel's founder, to be the director of quality assurance and customer service.[1] The "Employment Offer" letter stated that the job was "Full Time" and "Exempt" and paid an annual salary of $70,000. Knapp's direct supervisor was Heidi Orrock, née Diestel (Heidi), Joan's daughter and the wife of Diestel's president Jared Orrock (Jared).[2]

---

[1] Knapp's job title varied throughout her employment.

[2] For the sake of clarity, we refer to members of the Diestel and Orrock families by their first names. No disrespect is intended.

2.

Prior to the hiring, Joan sent Knapp an e-mail dated March 15, 2012, summarizing some of the latter's forthcoming work duties:

"TOUCHING THE CUSTOMER

 "-Acct Exec

 "-Frequency of contact (visit, phone) established

 "-Tasks—contacting decision maker, phone

  "Contacting store/unit, phone

"NEW PRODUCT INTRODUCTION-Customer Side

 "-Samples

 "-Placement of product

 "-Follow-up of sustained sales

"SAMPLES

 "-send, confirm, follow-up, placement

"HOLIDAY SERVICE to Customers

 "-worksheet/'letters'

 "-Holiday orders in, on schedule—it's Thanksgiving all year long!

 "-Customer delivery needs-date/time—customer drives the delivery schedule

 "-the ranch IS the Holiday Order Contact

"INVENTORY

 "-address overstocks, [less than optimum], etc[.]—making sure all is sold/handled

"NEW STORE OPENINGS

 "-[Point of sale], trainings, demos, etc.

"Tony's [Fine Foods] Communication

3.

"-facilitate with [Tony's Fine Foods customer service] and sales teams."

On October 23, 2017, Diestel reclassified Knapp as a customer service representative, a nonexempt employee. On November 17, 2017, Knapp resigned.

## II. The complaint

In a complaint filed January 16, 2018, Knapp claimed that Diestel failed to pay "compensation for overtime as required by law"; failed to provide "either uninterrupted meal or rest breaks"; failed to provide "timely and accurate wage and hour statements"; and engaged in "unlawful, unfair and fraudulent business practices." In an answer filed November 7, 2018, Diestel asserted—among other things—that Knapp's complaint "is barred, in whole or in part, to the extent [she] was exempt from such pay pursuant to the exemptions contained in the applicable wage and hour laws . . . ."

## III. Bench trial

### a. *Diestel's affirmative defense*

At the outset of trial, Diestel appeared to advance two separate exemptions: (1) the outside sales exemption; and (2) the administrative exemption. Diestel's counsel later clarified that "[Diestel's] position all along is that outside sales was a job title" and "wasn't the exemption"; instead, "[i]t's [the] administrative exemption that [Diestel] believe[s] applies here."

### b. *Knapp's testimony*

Knapp testified that she performed the duties enumerated in Joan's March 15, 2012 e-mail, save for inventory, trainings, and demonstrations. These duties essentially remained the same until her resignation in 2017. Over the course of her employment, Knapp managed many of Diestel's major accounts, including those of Del Monte,

4.

Draeger's, Newport Meats, Raley's, Safeway, and Tony's Fine Foods.  She "didn't do a lot with production . . . ."[3]

Knapp provided a description of her typical workday in a response to an interrogatory.  It read:

> "My typical days involved the following tasks:  Answering phones, which were either redirected or if a customer service issue addressed by me; responding to emails from customers and sales representatives, doing appropriate research to answer said emails; review Tony['s] Fine Foods sales report, respond to new customers therein, write thank you notes, discuss with my manager, discuss back orders and other ordering issues with appropriate personnel; responding to customer complaints, including consulting with management on appropriate responses; log customer complaints; log new customer inquiries, consult with management as to follow up; update customer service contact lists daily; pack merchandise, etc. for trade shows as approved by management; physically procuring and preparing for shipment customer samples; prepared summaries for management of promotional dollars spent weekly, new product sales, retail slice sales, key account sales, major distributor accounts; prepared promotional material for customers; in addition, I supported as needed all other customer service employees and sales employees."

At trial, Knapp elaborated further:

> "Well, the first thing I would typically do in the mornings would be to – I'd get an email from Tony's Fine Foods, and it would show all the sales for that day that went out.  We would look to see if there was any – I would look to see if there was any back orders for a customer, like if they weren't going to get what they ordered.  That would give me time to call the customer, let them know it wasn't coming, because I don't think Tony's called their back orders, let them know when it would be back in stock so that – I mean, I could ask Casey Overmier[4] to check the inventory.  I think she was more into the inventory part, when it would be back in stock at Tony's.

---

[3] At trial, Jared testified that Diestel's "production departments" "would be everything from feed milling and live operations or turkey farming."

[4] Overmier had been Diestel's customer service manager.  At the time of trial, she was a customer service sales analyst.

"I would look through it to see if there was anything that was new that was sold, like, if a customer first time ever bought turkey tails. I had thank-you cards with little feathers, so I would – and so I would write the customer a thank-you note with a little feather saying we appreciate you bringing a new item aboard.

"Then I would log those items on what I called my Diestel success stories. So I would say New Seasons bought this for the first time ever. So I would save all those so at the end of the month I could do a Diestel success report for Heidi [Orrock]. It would have all of the stuff that I gathered through the month, you know, that I sent out thank-you notes for. And then Dan Dentone[5] would send me a list of everything that he did, all the samples that he put out, what the customers' feedback was. So that was the end-of-the-month report on that duty. And that took generally a little bit of time in the mornings.

"We did QC [quality control] calls. But that changed. I mean, we did QC calls, but it changed between who was the customer service manager at the time. Sometimes, like, I would do it A through Z, and sometimes it would be, like, the top customers call first. Or sometimes they would give us a list of customers, you know, call all the natural grocers. I would do 50 calls. Robin [Decker] would do 50 calls. Occasionally I think Pam [Thomson] helped out with those when we got a little behind, but not often. It was usually just Robin and I doing all those sort of calls.[6]

"A lot of reporting. A lot of pulling Excel sheets for the regular monthly stuff that we had to do. Then I had the other stuff I had, a report for the new customer inquiry report, a sample report, the Diestel success stories report, a distributor report, which shows all of our distributors, and who was – I ranked them, like, 1 through 10 so that we could kind of see who was winning the race. And then all of the year-over-year reports for Heidi and Joan when they went out visiting customers like in the Pacific Northwest or down to Newport Meat Company, any[]place that was, you know, out of state or far away, big customers like Plymouth Poultry.

"Then there would be year-end meetings that Joan and Heidi would go to for Lundardi's [*sic*] restaurants because that was a big one for them. New Seasons, Market of Choice. There's a long list of larger customers that they want and visited at the year end. [¶] . . . [¶]

---

**5** Dentone was a Tony's Fine Foods employee.

**6** Decker and Thomson were customer service representatives for Diestel.

6.

"In between phone calls, constant phone calls. All the holiday – the holiday was a big deal. Really, that was a huge deal because if you make a mistake on a holiday order and you send out 200 oven-roasted turkey breasts and they want oven-roasted turkeys, you're going to be in trouble. So that was a daily thing from the minute we sent those letters out and started getting them back in January, that was constant. We had to call and confirm this was what they wanted, did they want anything else. And they would call all the time making changes throughout the whole year."

Knapp acknowledged that her prior experience in the food industry helped her at Diestel. She confirmed that—as part of her job—she made proposals to Heidi "regarding how [she] would conduct business with Diestel's customers . . . ." (Boldface omitted.) Knapp could not recall an instance when Heidi, "the ultimate decision-maker," refused her suggestion.

c. *Heidi's testimony*

Heidi testified that Knapp "really worked independently," "had very little oversight," and "used, throughout her job, the majority of the time, discretion, independent judgment, thoughtful, strategic thinking." When asked about how Knapp would "spend most of her time" (boldface omitted), Heidi stated that " 'manag[ing] all distributor and independent accounts, daily and holiday needs' " was "a really big piece." She detailed:

"Distributor, whether that be to a retailer like a Tony's Fine Foods or whether that be to food service outlets like a Newport [Meat] or Del Monte, right? This would be – this would be an entire trajectory, right? Your distributors are some of your largest customers. Like, we sell the majority of our pounds, you know, through these distributors because we're not running all of our own distribution. So we are not putting trucks – Diestel is not filling up a truck and shipping it to our customers. The majority of it is going through the distributor, right?

"So you talk about the manufacturer, who is Diestel, the distributor, and then the wholesaler. So – and the retailer. So [Knapp] managed all of the distributors for Diestel. Okay?

"Now, was she entering in their order on a weekly basis and billing it out and, you know, managing every single [purchase order]? No, she

wasn't doing that. She was managing them from a very strategic standpoint. She was talking with the executive levels, the buyers, the coordinators within those accounts . . . to ensure that there was direct communication, quick turnaround, great relationships, building our sales, growing our market share within all of these distributors.

"She also did that with very specific independent accounts. So that would be any category for our year-round products and production, from prepared foods in the deli segment, to the meat segment, to the wall deli segment, which, mind you, are three different people, three different buyers and three different personalities. A meatcutter in the meat department, a butcher, is going to be an entirely different person than a deli food service coordinator, who is more chefy and talking about, you know, a brie ham and arugula salad, okay?

"So there's a lot of dynamics here. There's a lot that she did. It came second nature to her because she had a whole career of doing this; but, nevertheless, [Knapp] was managing all distributors and independent accounts on a daily and the holiday. [¶] . . . [¶]

". . . [S]he would be taking – she would have phone calls set up with customers to review programs, to review new programs, existing programs. She would be, you know, working with, you know, the distributors, points of contacts, if there were any issues with products or needs for, you know, potential promotions, upcoming food shows. She would be working on holiday logistics planning.

"You know, there was some internal work internally to ensure that if she did set a promotion or she did make a great sale, you know, of a specific product or program, that Pam [Thomson] and Richard [Rust[7]] at the dock were actually executing that correctly. So she would have interaction in this way.

"She would be generating sales data to analyze. So she would be running sales reports to look at, to say year over year, month to month, how are we doing? What's performing? What isn't? Where do I need to be spending my time? I have my list of priorities; how do I need to shuffle them around?

"She would be potentially entering, you know, and reviewing, like, the spend, the ad spend, right? So she would get credit memos and debit

---

[7] Rust worked at a Diestel's processing plant in Chinese Camp.

memos and say, okay, how much did we spend? How did this go? And she'd be looking at that. She'd be logging it, and then she'd be looking to say but was this effective? Is this a good use of time? So it's a very –

"And then on the holiday – I guess I should finish – the holiday time frame, depending upon what time of year it was, she could be heavy on holiday work, where she's, like, planning a lot for the holidays or – you know, like March is usually when we get our first confirmation, and then we start entering those orders. And so she would be doing that. She would be receiving back the orders, which is a very important process, okay?

"Again, like, I know that it seems that it may not be to someone who doesn't do it, but if you do that receiving incorrectly and you misunderstand your customers' requests and demands, it goes into our system incorrectly, it gets produced incorrectly, and then whether or not you catch it, it could actually get delivered to a customer incorrectly.

"And the holidays are a really touchy piece of it. Because if you mess up a holiday for a customer, they usually remember that and they don't necessarily want to be with you in the following year. It's some of the biggest orders that our customers write. It's very important that these things are correct.

"So depending on the time of year, on a daily basis, she could be heavy into holiday or she could be really light on holiday and she could be working on other program planning with her distributors or her independent accounts."

Heidi highlighted more of Knapp's responsibilities. She specified how Knapp " '[m]anage[d] the holiday letter distribution process and ensure[d] completion of order taking' ":

"This means that [Knapp] is managing the holiday letter distribution process. So highly collaborative, internally speaking, with our IT team, with our systems team, who, – you know, sometimes that bleeds into the accounting team because he's closest in on IT, and he helps us. And we're saying, hey, we need to pull all the letters. We need to generate all the letters. We need to ensure that the letters are accurate, that the system didn't mess something up, and that the reference of their holiday order data year over year is actually correct. We would need to determine the cut-off times and days that were associated with the coming year. And [Knapp] would be a part of that process.

"Was she the person, you know, pressing the button? Probably not. But was she integrally involved in this process? Yes.

"When the letters were developed, she would be spot-checking everything and saying, okay, we're good to go or we're not good to go. This doesn't look accurate to me.

"If that was done incorrectly, you're talking about a huge component of the business, where the order data that you're sending out to your customers year over year would have been wrong. And, again, that's managing the holiday letter distribution process and ensures completion of order taking . . . . That's highly impactful in the success of the company and in the orders that are to be coming into our company year over year that we're already planning for, right? Because turkeys take a long time to grow. [¶] . . . [¶]

"So that's like a very key gatekeeper process that, if it goes poorly, it will impact, you know, the health – the customer relationship of the account management of Diestel with their customers for that singular holiday. [¶] . . . [¶]

". . . [W]hat I'm saying is that it's more than just a black-and-white type of duty, okay? Because given the fact that it's integral to the success of the previous holiday, there's a lot of collaboration between the departments that have to happen in order for this function to be performed because, as I said, we were trading out a lot of different programs and platforms, and there were issues year over year. The letters were a whole – were a whole situation.

"And then on top of that she would be determining the dates for the time line of that next year. She would be authenticating that the data was pulled correctly, that the orders were correct, which mind you, how would – like, if you don't recall, if you're not really thinking, if you're not, you know, very articulate, you're not going to be able to remember, you know, so-and-so's order from the previous year. So, you know, she was trusted to really use her judgment and determine the authenticity of this process. [¶] . . . [¶]

". . . So from there, in order to determine the time line for the next year, right – roughly we would say, okay, it's going to be in March. It was in March last time. But it's also dependent upon – like, let's take Easter, for example. Easter is sometimes in April. It's sometimes in March. Easter is a holiday that we would plan for. So she wouldn't just be able to go look at what we did last year, pick a date out of random thin air, and

10.

stick it on the order letter. She would have to work with our production team to say, 'Hey, when is this happening? Do we have this product at this time? If we confirm orders on this date, is that acceptable?' Right? This would be a very collaborative process. [¶] . . . [¶]

". . . [A]s to who sent the letters, [Knapp] herself would send those order letters out with a note that would describe, you know, the previous year, you know, what new items were happening, any, you know, relationship building that had happened over the previous year. 'Hey, I felt like this distribution logistics worked really well. I know that we want to change this, that, and the other about how we service your account this year,' so on and so forth.

"So [Knapp] would not only ensure that the entire process happened correctly, but then she would go and she would actually be sending and selling, as you call it, managing this account to garner their order for the coming year."

Knapp also "set[] ads, promotions with customers":

"So if [Knapp]'s going to set ads and promotions with customers, then she's going to have pulled sales reports to determine kind of a hit list of target of customers that she thinks needs promotions, items or categories that needs support and create promotional planners for either a quarter, a few months, a year, what have you.

"So in order to effectively plan and execute and establish a promotional schedule, you have to look back through previous history, sales, sales kind of analysis of what promotions did we run in the previous year, how effective were those, and what promotions do we want to run. What are my goals for the customer, strategically and tactically speaking? What are the customers' goals?

"She would have had to have had multiple discussion with buyers, executive levels, depending upon where she – who she was working with, from a Jackson [Wh]ole Grocer to a, you know, buyer of Del Monte or Rock Island or, you know, any of her distributors, and she would have had to have done a lot of fact finding and discussion around what are your goals? What do you want to accomplish this year? What are the sales trends? What do we want to – what do we want to push? 'Hey I'm [Knapp]. I really want to have more of your deli case. I only have an oven-roasted deli whole piece in this case, and I want smoked and honey and peppered, and I want my competitor out. So what is it going to take for me to earn that space in your set?' Right?

11.

"I mean, so simply to do this task there would have been a lot of discretion and judgment and thoughtful strategy planning in order to simply set ads and promotions with customers.

"Now, does that mean every single customer would take this much thought and effort and energy? No. Because she probably wouldn't have gotten through to every single customer, right? She carried a lot of weight. It was, like, 20 percent of, you know, our customer set was just with [Knapp]. And so there would be some customers that would be really easy, 'Hey, we do this every year. It's a rinse and repeat. Here we go. It's established.'

"But if she's looking to grow our market share and maintain our market share, a core goal of Diestel's has been, you know, pretty much every year to increase penetration within existing accounts, then you have to actually strategically think about what are these promotions going to do for me and my business with this customer? What's the buy-in from the buyer? How effective are they going to be? What's the [return on investment]? We're not in the business of just giving away margin and giving away sales dollars for the fun of it. And [Knapp] was tasked with doing this. [¶] . . . [¶]

". . . So we used a basis of 5 cents per pound, roughly, on any given account. So depending upon their sales volume in pounds, we would, you know, do a calculation of 5 cents per pound. If they were in that scope, that was fine. If it was something that was going to get outside or grotesquely exceed that, then in the case of [Knapp], you know, she would really be giving her recommendations and saying, 'Hey, if we want to win, if we want to have this set – you know, I talked to this buyer. I think we need to do this.' And it would be a very collaborative conversation around, you know, the promotional trajectory of a specific account that was outside of, you know, the very fundamental rule of 5 cents [p]er pound. [¶] . . . [¶]

"Each year we would set a bit of a market strategy. We would set goals that the company had for products or categories or segments of the market that we wanted to own or dominate, and then we would set a trajectory of promotional support, allowances, new item promotional offerings. That would kind of ladder up to her work and her trajectory and strategy that she was doing with her set of business.

"So, yes, there's general guidelines, and then each year we would kind of set a more umbrella-like strategy for our sales team, our customer service and sales team. And then we would go and work within those confines.

12.

"Now, [Knapp] was a highly collaborative individual. So she would go out and work her accounts. She was very independent in that way. She came from a career of industry knowledge, coming from Facciola and the food service world. She had context. She knew not only the distributors and the politics and the buyers within those distributors, but she knew the distributors' customers, all of the country clubs and food courts and how to kind of work the system in order to get your products placed. And that's just the food service channel. So [Knapp] came to us with this huge basis, probably at the time more than I even knew about that channel, and she was using her discretion to determine how to win with Diestel in that market. [¶] . . . [¶]

". . . [A]ll of these channels require a different go-to-market strategy. You can't do in retail what you do in food service. You can't do in food service what you think you're going to do in the online world. They're all different ways and different behaviors, different customer interactions, different ways that you appear on shelf. Your digital strategy, your on-shelf promotional or, you know, the way that you display on shelf, the ability in a retail setting to cross-merchandise with a bread and a turkey, versus food service, where you're going to have a signature sandwich or a chef's special – it's all very different and dynamic.

"And [Knapp] managed multiple channels, multiple sets of customers, and had a lot of girth to devise kind of that go-to-market strategy, if we're talking about specifically just this one bullet point of promotions and ads. [¶] . . . [¶]

". . . So we talked earlier in the trial about a 5-cent accrual across pounds for certain specific customers. [Knapp] would be able to take those accrued funds and apply them to promotional endeavors with customers – BOGO [buy one, get one free] deals, dollar off, 50 cents – to how she and her customers would set their goals for that sales period. [¶] . . . [¶]

". . . She would use those funds in a manner in which she saw fit. If she wanted to go largely outside of the bounds of the kind of normalcy in which we would conduct ourselves, she would then, you know, usually chat with me about it. But, again, she used her discretion the majority of the time. [¶] . . . [¶]

". . . Newport Meat Company is a distributor in Southern California. They buy 15 truckloads of turkeys at the holidays. They're one of the larger holiday customers, and they would – [Knapp] would coordinate their point-of-sale material . . . to be literally sent down in a truck to them. And

13.

she would coordinate that and organize that and do that with her judgment and discretion. [¶] . . . [¶]

". . . It would be any of those: brochures, posters, shirts, hats, pens, brochure holders. Like, anything that's going to support the sale, support the customer, support the way that the brand appears on shelf, that's promotional. [¶] . . . [¶]

". . . [L]ike Newport, for example, there would be some crazy asks of I need 500 hats. I need 300 hats. [¶] Okay. This is unreasonable. We're going to get you 100 or we're going to get you a sleeve or, you know – we can't – we're not in the business of, like, giving away thousands and thousands of hats.

"But she would use her discretion, and if she felt it was important that a certain sales rep within the Newport network received a specific amount of hats for their new business, then she had the discretion to do that."

Knapp played a significant role at food shows, which occurred "at least once a quarter" for "5 to 7 days":

"Well, so [Knapp], prior to the food shows, would be contacting customers, setting up appointments [for herself] with buyers, you know, working to establish the promotional offerings that we might have at those – in collaboration with me, establishing some of those promotional activities.

"And then at the food shows she was, you know, a Diestel representative, you know, conducting those meetings, having discussions with the buyers about, you know, the products we were launching, items that were coming out, holiday planning and logistics. Gosh, you know, the promotional plans, offers, you know, trying to probably, you know, fish for new – new customers that could be at the food show, creating industry contacts. All of the above. Any function of, you know, being outward-facing and trying to capture new sales, establish and increase our penetration with existing customers. Any of these things. [¶] . . . [¶]

". . . If it was a customer that [Knapp] would want me to sit in on the meeting or sit in on the discussion, then, you know, she would let me know, 'Hey, this customer is coming. I think, Heidi, it would be really important that you come by and say hello, talk with this customer,' so then I would be there.

14.

"But I would set up a lot of my own contacts and a lot of my own – you know, I would do the same thing that [Knapp] was doing for these shows."

d. *Jared's testimony*

Jared testified that Diestel's mission is "to produce the highest-quality turkey products available in the country" and "to deliver the highest level of service available in the food business." When questioned about Knapp's job duties as an "outside sales representative," he answered:

"From my assessment, which, again, I don't directly manage this function and never managed [Knapp], my understanding in the company's expectations of her role was really as an account manager. So to us that means she holds a very specific book of business. It includes distributors and retail customers. And her responsibilities are to maintain those relationships, maintain the sales, and grow the sales. So that's holiday, year-round. That's across multiple channels, including food service and retail grocery. And she is the primary point of contact for that book of business 12 months of the year. [¶] And so that does include, in [Knapp]'s case, traveling to meet with those customers to review prior period sales activities and discuss strategies for growing business, both at Diestel and with a given customer. [¶] . . . [¶]

"We believe she was exempt based on the entirety of her responsibilities, which was high-level account management. That included roughly 20 percent of our entire business. [¶] . . . [¶] . . . Account management is – is total responsibility and accountability to our business within specific accounts. [Knapp] happened to have a very substantial book of business across multiple channels, including distributors and retailers. And in our company her role would have been responsible for everything having to do with that customer, from day-to-day interactions, to sales strategies, to pricing negotiations, to promotional accrual/utilization, holiday execution and planning. So she is the primary point of contact for that customer. She's accountable to our success and our brand success within those outlets. [¶] . . . [¶]

". . . Managing those accounts as it relates to [Knapp]'s role would be maintaining that relationship, so often frequent communications, solving problems for them, understanding their business and how Diestel fits into it, understanding and kind of working with those customers on optimal product mix, pricing, promotions, order fulfillment and fill rates. Also any

15.

problems and kind of quality or distribution challenges, [Knapp] would be responsible for analyzing and solving those.  She also would be responsible for running reports, analyzing reports in order to strategize on the business going forward and try to grow our business within those accounts.”

Jared added that—in connection with account management—Knapp " 'w[]ork[ed] with production and outside sales to ensure quality and product consistency.' "  (Boldface omitted.)  He explained:

> "This is kind of the back end of account management, right?  So once – once you've made a sale, negotiated pricing, determined the distribution process and assigned a distributor if necessary, if it's not a distributor and actually sold and delivered a product, then there is the requirement in our case, right, where we're attempting to make – to produce the best products available and also to produce them consistently and offer industry-leading fill rates.  So this is the feedback loop side of it, back end of account management, ensuring once all that was done the product did arrive in good condition, good shelf life, the specs were met, deliveries are consistent and on time and orders are filled.  All those things.

> "So seeking that feedback is the first step of that process.  And then, unfortunately, there are times where it's not what we want, and so the sales/customer service team needs to go back to the production and operations team, share those concerns and coordinate with those teams to get those issues rectified.  And then once again kind of go back through that process to ensure that once we think it's corrected, in fact, it is, based on customer feedback and follow-up."

Regarding Knapp's exercise of discretion and independent judgment, Jared testified:

> "I think probably the largest or most impactful example of that is both pricing and promotional planning and strategies.  And so she did have discretion within her book of business to negotiate those pricing considerations.

> "She also had the authority to develop the strategy and execute promotional programs within the company's kind of set guidelines, which are different today, but at the time and historically under Joan was really an accrual system.  So we would accrue X cents per pound sold to an account.  So as pounds sold grows, so too does that accrual of promotional dollars,

16.

which then can be deployed at the discretion of that account manager.[8]  So that, again, at the end of the year is a significant cost to our company.  And in [Knapp]'s role she would have had discretion over both of those functions.

> "And then another one here that jumps out, customer inquiries, all new customer inquiries went through [Knapp].  So in a given week – you know, I really don't know how many new customer inquiries come through, whether it's by email or phone call.  Those all would route through to [Knapp], and it would be completely up to her discretion to vet those out, elevate those that make sense – or may make sense to our company or take different course of action if something really wasn't a fit or didn't make sense for us.

> "So, again, she was the gatekeeper there.  So Heidi, myself, Joan, nobody would ever see any of that without [Knapp] first making her own assessment, appraisal of those, and sharing it out with the appropriate team.  And I think that, again, is another really critical area where discretion and judgment were completely necessary."

As to Knapp's discretion "to change the prices" "within her book of business" (boldface omitted), he remarked:

> "It's really a case-by-case basis, right?  And so as an account manager, whether it's [Knapp] or Heidi . . . , it really has to be case by case, and this is why a specific individual who is the primary point of contact is responsible for that.

> "In most cases – or in, I guess – at the highest level, right, the cost accountants, our accounting team, sometimes myself will set target prices, or a file price, we call it, or a list price.  If you look at any given period, the average sales price across 4- or 500 different items is almost never that file or list price that was set by the accountants.  And that's because in each scenario, in each account or each channel, there are different competitive dynamics, different competitors, and different needs to price that differently.  So the same product in our business is certainly not line priced.  Customer A may pay – let's say list price is $5.  Customer A might pay 4.99, while customer B may pay 4.70

---

**8** When questioned about the amount of promotional funds that Knapp had at her disposal in 2017, Jared estimated a total of $100,000.

"And so if you're talking about a big variance, which I would say 4.70 off of a five-dollar item is a big variance to us, those are things we're going to want to know about and Heidi or myself or our cost accountants are going to want to look at and determine if that's good business. But there's no hard-and-fast rules, and it's really driven by competitive dynamics, as well as our willingness to reduce price based on strategic needs. [¶] . . . [¶]

"[Knapp] was [a member of management]. She was – her role had the discretion to make these decisions and we expected she would know when to raise questions around anything up to a larger group or when to just make decisions and execute."

e. *Testimony of Casey Kerns*

At the time of the trial, Kerns was Diestel's human resources and safety coordinator. Although he and Knapp worked in different departments, he was familiar with her duties. Kerns testified:

"[O]utside sales has really evolved for us as a company. [Knapp] was truly our first outside sales rep. And since then we've branched out and we have more, but [Knapp] was the first one that was still part of our customer service department, was the one that was out meeting with new customers and developing new business and developing strategies within existing customers to grow existing business. [¶] . . . [¶] . . . So as the outside sales rep, she's out meeting with clients . . . . But also, as any reasonable person would know, the work doesn't just start and stop when you're meeting with a client. It's – there's a ton of preparation work, developing marketing materials, developing strategic planning. All of that goes into it. So I don't know how much time she would spend on all of that. [¶] . . . [¶]

". . . The account management of her customers. I can't speak to the number of accounts or how big or the sales of those accounts. It's not part of my duties. But she was absolutely critical to our business, handling a lot of these accounts entirely on her own. [¶] . . . [¶] . . . Again, I'm not in her department so I can't tell you, like, you know, how her day goes; but, generally speaking, in the management of these accounts you're taking phone calls from the – you know, the buyers of some of these big grocery store chains or multistate chains. You are discussing current business. You're upselling for future business or other products. You're – you know, you're trying to grow their business, grow our business. You're out on the floor at times, showing product samples. You're – again, there's other folks that could speak much better to this, but, you know, like when – for

18.

example, when the head buyer of one of those stores calls they're calling for [Knapp] specifically because she's in charge of that account. [¶] . . . [¶]

". . . I think she was critical to the strategic planning of future sales and growing current business. [¶] . . . [¶] . . . So she would collaborate with the owners of Diestel on, you know, the best – the best way for us to grow our business. And part of that was based on, you know, her extensive history in the meat business. [¶] . . . [¶]

". . . So to my knowledge she managed our distributors, which then had a certain number of retailers per distributor, and then she also had a high number of large retail accounts herself. So, yes, a regular customer service rep might take an order for 15 turkeys, where [Knapp] would facilitate a full order of, like, 15 truckloads of turkeys. [¶] . . . [¶] . . . [S]he was in charge of those large-quantity sales. But not just the sales, the entire customer relationship. [¶] . . . [¶] . . . [S]he handled [large] account[s] in [their] entirety. She was the face of the company to th[ose] customer[s]. She set pricing. She set the strategy going forward. She facilitated the entire thing. She had the discretion to do that."

Kerns pointed out that "a regular customer service representative would not have the discretion to send samples to try and make a sale," but Knapp was able to "send[] samples for a customer to try before they worked out a deal."

## IV.  The superior court's ruling

In a statement of decision filed April 27, 2021, the superior court concluded that "Diestel properly classified Ms. Knapp as an exempt employee under the administrative exemption." The statement read:

"California law presumes employees are non-exempt and are entitled to overtime compensation. [Citations.] On the other hand, properly classified exempt employees are not entitled to overtime pay. An employer's claim that an employee was properly classified as an exempt employee constitutes an affirmative defense. Because Diestel relies on its classification of Ms. Knapp as an exempt employee in its defense to Ms. Knapp's claims, Diestel has the burden of proving that Ms. Knapp was an exempt employee.

"In order to meet its burden of proof on the affirmative defense, Diestel was required to show at trial that Ms. Knapp earned at least twice the California minimum wage (often referred to as the 'salary test') and that

19.

Ms. Knapp spent more than half of her time performing exempt duties. Initially, Diestel relied on two claims of exemption: exempt outside sales and the administrative exemption. However, Diestel abandoned the outside sales exemption claim early on in the trial. The parties both acknowledge that Diestel satisfied the salary test requirement. The focus of the trial, therefore, was whether Diestel could establish that Diestel properly classified Ms. Knapp as non-exempt under the administrative exemption.

"The applicable California Wage Order establishing the administrative exemption requires that each of the following apply in order for an employee to be exempt:

"1. The employee's duties and responsibilities must involve the performance of office or non-manual work directly related to general operations of his or her employer or his or her employer's customers;

"2. The employee must customarily and regularly exercise discretion and independent judgment;

"3. The employee must regularly and directly assist a proprietor or another employee in bona fide executive or administrative position or who performs under only general supervision special assignments and tasks[9]; or

"4. The employee must execute under only general supervision special assignments and tasks; and

"5. The employee must be primarily engaged (more than 50% of the time) in duties that meet the test of exemption

"[Citations.]

"Both sides acknowledge that Ms. Knapp worked in conjunction with Diestel's customer service department. They also agree that her job was to facilitate sales of Diestel's products. The agreement of the parties ends there.

"[Knapp] attempted at trial to establish that she was more of a clerical/production type employee. [Knapp]'s case minimized Ms. Knapp's

---

**9** The court's recitation of this element of the administrative exemption mistakenly substituted the phrase "special assignments and tasks" for "work along specialized or technical lines requiring special training, experience, or knowledge." (See at p. 27, *post*.)

exercise of judgment and the significance of her role as the face of Diestel Turkey with large customers and distributors.

"Diestel offered the testimony from Heidi Diestel, Casey Kerns, Jared Orrock and through cross-examination of Ms. Knapp in an attempt to demonstrate that she spent a large majority of her time performing account management duties with very limited supervision. Diestel emphasized that Ms. Knapp exercised her own direction and independent judgment as she engaged in account management duties with customers. Several witnesses, including Heidi Diestel and Jared Orrock, testified that Ms. Knapp played a critical role in managing a significant portion of Diestel's business and in strategic planning for expanding Diestel's market. The evidence showed that Ms. Knapp used independent discretion in her work managing Diestel's largest and most important accounts, which accounted for approximately twenty percent (20%) of Diestel's annual business. The evidence showed that as the account manager she played a significant role in pricing decisions and negotiations, developing sales strategies and holiday season execution and planning. Numerous witnesses emphasized that Diestel hired Ms. Knapp in large part due to the fact that she had specialized and significant experience in the meat industry, and had developed an ability to manage these accounts with only very general supervision. In addition, the evidence showed Diestel assigned Ms. Knapp special projects such as overseeing the holiday order process and Diestel provided very little supervision on that front. Ms. Knapp's supervisors testified that these types of special projects were critical to Diestel's success as a company. The evidence showed that Ms. Knapp controlled in large measure how she spent her time at work. Diestel management personnel also testified that Ms. Knapp had a certain amount of discretion with regard to promotional activity and that she had the delegated authority to discount pricing for customer accounts she controlled.

"Among the tasks that Ms. Knapp performed were meeting with new customers, developing new business, and developing strategies to grow existing business. Testimony elicited at trial established that Ms. Knapp was not simply a regular customer service sales person. She had the assignment to handle entire customer relationships on behalf of Diestel. She set pricing to some extent, developed strategies in maintaining and increasing the business with various customers and handled those customer accounts in their entirety. Diestel gave her discretion not given to other customer service representatives, such as discretion to send out samples to customers or potential customers. Ms. Knapp worked on a daily basis with Diestel's main distributor, Tony's Fine Foods. Ms. Knapp was also involved with pricing negotiations, accrual and use of promotion funds, and

21.

was the primary contact for many customers of Diestel. Ms. Knapp was involved in preparing for and conducting marketing for Diestel at food shows.

"According to the testimony of Heidi Diestel, Ms. Knapp was in charge of making choices regarding creating promotional offers and strategically planning an order to increase sales and promote Diestel products. Diestel relied on Ms. Knapp's specialized knowledge and experience in dealing with distributors and customers of its distributors to get Diestel products placed in a variety of settings. Ms. Knapp managed customers who worked with Diestel's distributor Tony's Fine Foods to be sure that the distributor was providing good service to those customers.

"[Knapp] testified that she did not really do production work. She also testified that she managed all distributor and independent accounts daily and holiday needs [citation]. The evidence also established that she managed customer complaints and made business-related proposals to her supervisor, which were always accepted and acted upon to increase sales. Mr. Orr[o]ck similarly testified that [Knapp] maintained good relationships with her accounts, grew sales across multiple channels, was the main point of contact with a large percentage of Diestel's main customers and independently managed a promotional budget. [Citation.]

"Based upon the evidence presented, the Court finds that [Knapp] spent more than 50% of her work time performing exempt duties, including both assisting the proprietor relating to the general business operations of Diestel and Diestel's customers and performing work under only general supervision that required specialized training. In performing these tasks [Knapp] exercised discretion and judgment."

Given Knapp's exempt status, the court did "not make findings on the overtime and meal break claims." Judgment was entered on June 14, 2021.

## DISCUSSION

### I. Overview of relevant law

"California law provides that, absent an exemption, an employee must be paid time and a half for work in excess of 40 hours per week. To be exempt from that requirement the employee must perform specified duties in a particular manner and be paid 'a monthly salary equivalent to no less than two times the state minimum wage for full-time employment.' " (*Negri v. Koning & Associates* (2013) 216 Cal.App.4th 392,

22.

394, quoting Lab. Code, § 515, subd. (a).) "The Labor Code authorizes the Industrial Welfare Commission (IWC) to establish [such] exemptions . . . ." (*Semprini v. Wedbush Securities, Inc.* (2020) 57 Cal.App.5th 246, 251.)[10] "[T]he IWC has promulgated 17 different wage orders that apply to distinct groups of employees." (*Combs v. Skyriver Communications, Inc.* (2008) 159 Cal.App.4th 1242, 1253 (*Combs*); see Cal. Code Regs., tit. 8, §§ 11010-11170.) In the instant case, the pertinent wage order is IWC Wage Order No. 4-2001 (Wage Order No. 4), which is codified in title 8 of the California Code of Regulations and titled "Order Regulating Wages, Hours, and Working Conditions in Professional, Technical, Clerical, Mechanical, and Similar Occupations." (See Cal. Code Regs., tit. 8, § 11040; see also *id.*, subd. 2(O) [nonexclusive list of jobs within Wage Order No. 4's ambit].)

California Code of Regulations, title 8, section 11040, subdivision 1(A) "provides that portions of [Wage Order No. 4]—including provisions relating to overtime pay, meal and rest periods and wage statements—do not apply to 'persons employed in administrative, executive, or professional capacities.' [Citations.]" (*Soderstedt*, *supra*, 197 Cal.App.4th at p. 145; see *Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974, 979.) Subdivision 1(A)(2) sets forth the "Administrative Exemption":

"A person employed in an administrative capacity means any employee:

> "(a) Whose duties and responsibilities involve either: [¶] (i) [t]he performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his[/her] employer's customers; or [¶] (ii) [t]he

---

**10** " ' "The IWC, established by the Legislature in 1913, was the state agency authorized to formulate the regulations, or wage orders, that govern employment in California. [Citation.] In fulfilling its broad statutory mandate to regulate wages, hours, and working conditions of California employees, the IWC acted in a quasi-legislative capacity. [Citation.] Although the IWC was defunded effective July 1, 2004, its wage orders remain in effect. [Citation.]" [Citation.]' [Citation.]" (*Soderstedt v. CBIZ Southern California, LLC* (2011) 197 Cal.App.4th 133, 145, fn. 1 (*Soderstedt*).)

performance of functions in the administration of a school system, or educational establishment or institution, or of a department or subdivision thereof, in work directly related to the academic instruction or training carried on therein; and

"(b) Who customarily and regularly exercises discretion and independent judgment; and

"(c) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity . . . ; or [¶]  (d) [w]ho performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or  [¶]  (e) [w]ho executes under only general supervision special assignments and tasks; and

"(f) Who is primarily engaged in duties that meet the test of the exemption.  The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order:  29 C.F.R. Sections 541.201-205, 541.207-208, 541.210, and 541.215.[11]

---

[11] The language of California Code of Regulations, title 8, section 11040, subdivision 1(A)(2)(f) "expressly incorporates certain [Fair Labor Standards Act] regulations effective as of the date [Wage Order No. 4] was issued" (*Combs*, *supra*, 159 Cal.App.4th at p. 1254), i.e., January 1, 2001 (*Harris v. Superior Court* (2011) 53 Cal.4th 170, 177, fn. 1).  "Effective August 23, 2004, the [federal Department of Labor] revised the [Fair Labor Standards Act]'s implementing regulations governing certain exemptions from the [federal] minimum wage and overtime pay requirements, including the exemption for any employee employed in a bona fide administrative capacity." (*Combs*, *supra*, at p. 1255, fn. 5.)  "The purpose of the 2004 revisions . . . was to 'simplify, clarify and better organize the regulations defining and delimiting the exemptions for administrative, executive and professional employees.'  [Citation.]" (*Soderstedt*, *supra*, 197 Cal.App.4th at p. 150; see Simmons, Wage and Hour Manual for Cal. Employers (25th ed. 2022) § 10.3(a)(7) ["Many provisions of these regulations will aid in the interpretation of California law.  The mere fact that the Wage Orders cite provisions of the federal regulations that existed on October 1, 2000 should not alter this conclusion.  Indeed, many features of the updated federal regulations do not change the prior standards; rather, they offer helpful clarifications and embellishments that address modern-day work settings based upon principles enunciated in judicial and administrative interpretations of the prior regulations."].)  Thus, courts may rely on the revised federal regulations in interpreting Wage Order No. 4's administrative exemption. (*Soderstedt*, *supra*, at p. 150.)

Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement.

"(g) Such employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. . . ." (Cal. Code Regs., tit. 8, § 11040, subd. 1(A)(2); accord, *Combs*, *supra*, 159 Cal.App.4th at p. 1254.)

"[T]he assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the employee's exemption." (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 794-795.)

## II. Analysis

a. *Contrary to Knapp's assertion, the superior court did not concoct a new "hybrid" administrative exemption.*

On appeal, Knapp contends that "[t]he trial court's decision is based on an incorrect statement of the law." She explains:

"The trial court in setting forth the applicable standard borrowed elements from a distinct type of administratively exempt employee, one who executes special assignments and tasks under only general supervision[] [citation] and added this as alternative to the required element that the employee directly assist a proprietor or exempt executive or administrative employee as specified in the Wage Order. [Citations.] The test as set forth by the Wage Order provides, '(c) [an employee] who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity.' [Citation.] This is a mandatory element. The trial court in setting forth the applicable law stated this requirement as an alternative: 'The employee must regularly and directly assist a proprietor or another employee in bona fide executive or administrative position *or who performs work under only general supervision special assignments and tasks*." [emphasis added.] The test as

25.

set out by the trial court could be satisfied by an employee who either directly assists a proprietor 'or who performs under only general supervision special assignments or tasks.'

"There is no such exemption. The statement of the applicable law as set forth by the trial court completely scrambles the analysis and makes it impossible to know what the trial court did. The applicable law as set out by the trial court creates a new hybrid exemption: an employee who has duties administering the business **or** who performs specialized assignments under general supervision. The trial court further confounds the question when it then lists as an apparently distinct exemption an employee who executes under only general supervision special assignments and tasks. [Citation.] It is impossible to say from its Statement of Decision how these various standards were applied in this case."

"We review the trial court's interpretation of statutes and regulations de novo." (*Combs*, *supra*, 159 Cal.App.4th at p. 1253.) "As quasi-legislative regulations, wage orders are to be construed in accordance with the ordinary principles of statutory interpretation. [Citation.] 'The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law.' [Citation.] To determine that intent, the court turns first to the words, attempting to give effect to the usual, ordinary import of the language and to avoid making any language mere surplusage. [Citations.] When the language is clear, we must apply that language without further interpretation. [Citation.] 'If there is no ambiguity in the language of the statute, "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." ' [Citation.]" (*Singh v. Superior Court* (2006) 140 Cal.App.4th 387, 392.)

The pertinent regulatory language shows that the administrative exemption has five elements. First, the employee's duties must involve "[t]he performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his[/her] employer's customers . . . ." (Cal. Code Regs., tit. 8, § 11040, subd. 1(A)(2)(a)(i).) Second, the employee must "customarily and regularly exercise[] discretion and independent judgment . . . ." (*Id.*, subd. 1(A)(2)(b).)

26.

Third, the employee must either "regularly and directly assist[] a proprietor, or an employee employed in a bona fide executive or administrative capacity . . . *or* [¶] . . . perform[] under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; *or* [¶] . . . execute[] under only general supervision special assignments and tasks . . . ." (*Id.*, subd. 1(A)(2)(c)-(e), italics added.)  Fourth, the employee must be "primarily engaged in duties that meet the test of the exemption." (*Id.*, subd. 1(A)(2)(f).)  Finally, the employee "must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment." (*Id.*, subd. 1(A)(2)(g).)

The wording as to the third element is clear and unequivocal:  said element may be established in one of three different ways.  (See *White v. County of Sacramento* (1982) 31 Cal.3d 676, 680 ["[U]se of the word 'or' in a statute indicates an intention to use it disjunctively so as to designate alternative or separate categories."].)  Thus, the regulatory language undercuts Knapp's argument that the third element could *only* be satisfied upon proof that she regularly and directly assisted a proprietor or an employee employed in a bona fide executive or administrative capacity.[12]

   b. *Substantial evidence supports the superior court's judgment in favor of Diestel.*

"Whether an employee satisfies the elements of [an] exemption is a question of fact reviewed for substantial evidence." (*Heyen v. Safeway Inc.* (2013) 216 Cal.App.4th

_____

[12] As noted, the court's recitation of the third element of the administrative exemption substituted the phrase "special assignments and tasks" for "work along specialized or technical lines requiring special training, experience, or knowledge." (See *ante*, fn. 9.)  Knapp also points this out.  This mistake, however, is not the crux of her argument.  In any event, the error appears to be clerical since the statement of decision's factual findings referred to Knapp's "specialized knowledge and experience" and her assigned "special projects." (Cf. *Squier v. Davis Standard Bread Co.* (1919) 181 Cal. 533, 536-537 [the possibility that the jury could have been misled by an instruction's improper use of "the" instead of "a" was remote in view of the totality of the instructions].)

27.

795, 817; see *Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 513 ["Under the general rules applicable to a trial court's statement of decision, an appellate court . . . applies the substantial evidence standard to findings of fact."].) "Thus, our authority begins and ends with a determination whether, on the entire record, there is any substantial evidence—that is, of ' "ponderable legal significance," ' reasonable, credible and of solid value—contradicted or uncontracted, which will support the judgment." As long as there is such evidence, we must affirm. [Citation.]" (*Nordquist v. McGraw-Hill Broadcasting Co.* (1995) 32 Cal.App.4th 555, 561.) "Moreover, when . . . the evidence is in conflict, the appellate court will not disturb the findings of the trial court. The court must consider the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference and resolving conflicts in support of the judgment." (*Ibid.*; see *Holt v. Ravani* (1963) 221 Cal.App.2d 213, 215 ["The credibility of the witnesses, as well as all the conflicts in the evidence, were the exclusive province of the trial court."].)

On appeal, Knapp does not dispute that the "salary test" set forth in California Code of Regulations, title 8, section 11040, subdivision 1(A)(2)(g) was satisfied. (See *Combs*, *supra*, 159 Cal.App.4th at p. 1263.) Instead, she challenges the court's findings as to the remaining elements of the administrative exemption. We conclude substantial evidence supports these findings.

      i.  <u>Duties and responsibilities involving the performance of office or non-manual work directly related to Diestel's management policies or general business operations</u>

"To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers." (29 C.F.R. § 541.201(a) (2022).) "To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example,

from working on a manufacturing production line or selling a product in a retail or service establishment." (*Ibid.*; see *Palacio v. Progressive Ins. Co.* (C.D.Cal. 2002) 244 F.Supp.2d 1040, 1047 ["[A]n employee who negotiates with clients and settles damage claims on behalf of an employer engages in duties consistent with the servicing of a business even though those activities can be viewed as ancillary to the provision of a good or service."].)[13]

The record—viewed in the light most favorable to Diestel—demonstrates that Knapp handled accounts that comprised of approximately 20 percent of the company's business on a daily basis. Her management of these accounts helped Diestel maintain or grow its market share. As the clients' primary point of contact, Knapp directly communicated with their representatives: she delivered product samples, negotiated pricing, developed sales strategies, established promotions, evaluated product quality, and oversaw holiday orders, among other things. Knapp generated sales reports, which she used to analyze product performance and prioritize areas in need of improvement. She offered recommendations to her superiors—such as deviating from the company's standard five-cents-per-pound accrual system to increase promotional funds for a particular client—and such recommendations were typically accepted. (See *Smith v. Johnson & Johnson* (3d Cir. 2010) 593 F.3d 280, 285 ["[The plaintiff's] non-manual position required her to form a strategic plan designed to maximize sales in her territory."]; *Palacio v. Progressive Ins. Co.*, *supra*, 244 F.Supp. 2d at p. 1047 ["The evidence establishes that [the plaintiff] was 'advising the management, planning, negotiating, [and] representing' [the defendant] throughout her employment and generally 'servicing' the business."].) Knapp also headed the holiday letter distribution process. (See 29 C.F.R. § 541.203(c) (2022) ["An employee who leads a team of other

_____

[13] Federal law interpreting Fair Labor Standards Act exemptions that are similar to state law exemptions at issue is properly considered as persuasive authority. (See *United Parcel Service Wage & Hour Cases* (2010) 190 Cal.App.4th 1001, 1015.)

29.

employees assigned to complete major projects for the employer . . . generally meets the duties requirements for the administrative exemption, even if the employee does not have direct supervisory responsibility over the other employees on the team."].)  Substantial evidence supports a finding that Knapp's work "satisfied the 'directly related to the management or general business operations of the employer' provision of the administrative employee exemption because it involved a high level of planning and foresight, and the strategic plan that [she] developed guided the execution of her . . . duties."  (*Smith v. Johnson & Johnson*, *supra*, 593 F.3d at p. 285.)

### ii.   Regular exercise of discretion and independent judgment

"To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance.  In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.  The term 'matters of significance' refers to the level of importance or consequence of the work performed."  (29 C.F.R. § 541.202(a) (2022).)

"The phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises.  Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to:  whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial

30.

impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances." (29 C.F.R. § 541.202(b) (2022).)

"The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." (29 C.F.R. § 541.202(c) (2022).)

The record—viewed in the light most favorable to Diestel—demonstrates that Knapp exercised discretion and independent judgment with respect to matters of significance in the performance of her duties. She identified areas of need—e.g., advertising, promotions—and set priorities based on her analysis of a client's sales data and goals. Knapp decided how to expend promotional funds, which could total up to $100,000 in a single year. She advised her superiors on business concerns in light of competitive dynamics, such as increasing a particular client's promotional funds. Knapp

31.

negotiated pricing, responded to complaints, and was in charge of the holiday letter distribution process. In addition, as part of her job, she vetted inquiries by prospective clients. Knapp's decisionmaking was informed by her industry experience and connections. (See 29 C.F.R. § 541.202(e) (2022) ["The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources."].)

iii. Categorization requirement

To qualify for the administrative exemption, an employee must fall into one of the following three categories: (1) he or she "regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity"; (2) he or she "performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge"; or (3) he or she "executes under only general supervision special assignments and tasks." (Cal. Code Regs., tit. 8, § 11040, subd. 1(A)(2)(c)-(e).)

The record—viewed in the light most favorable to Diestel—demonstrates that Knapp reported directly to Heidi, the daughter of Diestel's founder Joan and the wife of Diestel's president Jared. When appropriate, Knapp advised and/or consulted with Heidi and/or Jared. Her ability to independently manage her accounts, which included many of Diestel's major accounts, was buttressed by her extensive industry experience; in fact, it may be reasonably inferred from the record that this experience was vital to her hiring. Finally, Knapp was entrusted with special assignments and tasks—including the holiday letter distribution process and quarterly food shows—with little or no oversight. Substantial evidence supports a finding that Knapp was within the ambit of at least one of the three categories set forth under California Code of Regulations, title 8, section 11040, subdivision 1(A)(2)(c) through (e).

32.

iv.  <u>Primary engagement in duties that meet the test of the exemption</u>

To qualify for the administrative exemption, an employee must be "primarily engaged in duties that meet the test of the exemption."  (Cal. Code Regs., tit. 8, § 11040, subd. 1(A)(2)(f).)  " 'Primarily' . . . means more than one-half the employee's work time."  (*Id.*, subd. 2(N); accord, Lab. Code, § 515, subd. (e).)

Here, Heidi testified that Knapp spent most of her time on the job performing exempt duties related to account management.  "A single witness's testimony may constitute substantial evidence to support a finding."  (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

## DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded to defendant and respondent Diestel Turkey Ranch.


DETJEN, J.

WE CONCUR:


HILL, P. J.


SNAUFFER, J.


33.